IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| BCD, LLC; ROSEN CAMPUS I, LLC; CR-MERC, LLC; and ROSEN-WT MANAGEMENT, LLC, | ) ) ) ) | Case No.: 6:05-CV-2152-GRA |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER** **(Written Opinion)** |
| BMW MANUFACTURING CO., LLC f/k/a BMW MANUFACTURING CORP., | ) ) ) | |
| Defendant. | ) ) | |

This matter is before the Court on: (1) the motion for summary judgment filed by Defendant BMW Manufacturing Co., LLC ("BMW") on October 4, 2007, and (2) the motion for partial summary judgment filed by Plaintiffs on October 30, 2007.   After carefully considering the motions and memoranda filed in support thereof, the Court hereby GRANTS BMW's Motion for Summary Judgment and DENIES Plaintiffs' Motion for Partial Summary Judgment for the reasons stated below.

## I.  FACTS

This lawsuit arises out of what is now referred to as Clemson's CU-ICAR campus.[1]  Dating back to 1992, BMW and Clemson University ("Clemson") worked

---

[1]

 The parties have submitted over 3,500 pages into the record before the Court, including excerpts from the more than fifty (50) depositions taken by the parties.  The Court has reviewed the entire record submitted by the parties.  The following summary is by no means a complete recitation of all evidence considered by the  Court; rather, it is a basic summary intended to provide the factual setting for the legal  rulings in this Order.

together on education goals.  As early as 2001, Clemson was separately exploring the development of a wind tunnel which would cater to the racing industry.  In July 2001, Dr. Chris Przirembel of Clemson made a formal presentation of the wind tunnel to BMW's President, Dr. Helmut Leube.  Dr. Leube supported the idea of educating potential automotive engineers at Clemson, but indicated that BMW was not interested in funding a wind tunnel.  After the meeting, Dr. Leube wrote South Carolina Secretary of Commerce Charles Way, proposing to "[e]stablish a Center of Automotive Technology in partnership with Clemson University" and calling upon the State and BMW to "jointly do what will be required to turn [the opportunities] into reality."  (Exhibit 6 to Memorandum in Support of BMW's Motion for Summary Judgment.)  The center referenced by Leube would ultimately become the Carroll A. Campbell, Jr. Graduate Engineering Center ("GEC").  Neither BMW, Clemson, nor the State had selected a site for the GEC.

A potential site for the separate wind tunnel had been identified by local leaders in Greenville on property owned by the late textile magnate John Hollingsworth.  To serve as the potential developer of the wind tunnel, Clemson contacted Clifford Rosen, the principal behind each of the Plaintiff entities.  On August 31, 2001, Rosen wrote Clemson expressing his interest in developing an "off campus" facility known as the "Clemson University Center for Motor Sports Excellence."  (Ex. 8 to BMW's Memorandum.)  By late 2001, Rosen had learned of BMW's negotiations with the State for a State-funded initiative that might benefit Clemson.  Rosen was introduced by Clemson officials to the Hollingsworth

organization and immediately began negotiating a land purchase.

On January 23, 2002, Rosen, through Plaintiff BCD, LLC, entered into a contract (the "Hollingsworth Contract") to acquire rights to a 407-acre parcel in Greenville County, adjacent to Interstate 85 (the "Hollingsworth Property").  By this point, Rosen had begun negotiations with Clemson, assuring Dr. Przirembel by letter dated January 2, 2002 that: (1) Rosen would donate 25 acres to a charitable organization, (2) that Rosen would "coordinate and provide all financing and equity funding needed to develop the wind tunnel," and (3) that "Clemson University will have no financial or legal responsibility to Rosen whatsoever."  (Ex. 15 to BMW's Memorandum.)  Rosen expressed that Clemson's trademark "may" be licensed to "the Charity" for use "as part of the Facility and its educational and research programs." *Id.*

The identified charity was a subsidiary of the Clemson University Foundation ("CUF") called AMREC, LLC ("AMREC").  Rosen formed Plaintiff CR-MERC, LLC ("CR-MERC"), and on April 4, 2002, AMREC and CR-MERC signed a nine-page "Agreement" (the "April 2002 Agreement") in an attempt to establish an AMREC campus centered around a wind tunnel on the Hollingsworth Property.  (Ex. 17 to BMW's Memorandum.)  The AMREC campus was to consist of a combination of parcels, some purchased by AMREC, some donated by Rosen.  Rosen was to be the exclusive developer of the AMREC campus and was to receive development and management fees if projects were developed by him on the AMREC campus.

The April 2002 Agreement called for negotiations on twelve (12) other

subject areas (identified as "Exhibits") to be completed by May 1, 2002. *Id.* These identified subject areas for the required Exhibits included the material aspects of the deal, such as how the land would be divided, how the land would be developed, and what the development could look like. Any modification of the April 2002 Agreement was required to be made in a signed writing. Paragraph 10 of the April 2002 Agreement provided that:

> Failure to Agree Upon Exhibits. In the event that AMREC and CR-MERC are unable to agree to any of the Exhibits to be attached to this Agreement, then at any time after May 1, 2002, either party, may, upon ten (10) days notice to the other party, cancel this Agreement, whereupon the parties shall be relieved of all obligations to each other.

*Id.* Between April 4, 2002 and May 1, 2002, Clemson and Rosen worked to develop agreements which would address the identified subject areas for the Exhibits. The parties signed Exhibits in some subject areas, but did not complete signed documents for all of the Exhibits. Most significantly, the parties did not sign a document covering the subject matter designated as falling under "Exhibit G" by the April 2002 Agreement, which was the only document setting forth what parcels of real estate the parties were to receive. *Id.* To complete Exhibit G, the April 2002 Agreement required that the parties agree and make a "designation" of what parcels would comprise the "[20 acre] Donated Parcel, the [5 acre] Wind Tunnel Parcel and the remaining seventy-five (75) gross acres from which the Option Parcel may be created." *Id.* In sum, the parties were required to agree on the specific land that would comprise a total of 100 acres that Clemson could acquire through AMREC under the agreement.

The April 2002 Agreement also called for two different Exhibits related to what could and could not be built on the property:  (1) a "Reciprocal Easement and Operating Agreement" ("REA") which would govern only what could be built on the eventual 100 acre AMREC Campus; and (2) a "Master Association Agreement" which would govern what Rosen could build on his remaining acreage surrounding the campus.  *Id.*  The parties did not sign any document comprising these identified subject areas by May 1, 2002.  In an effort to address this subject area, Rosen's attorney suggested combining these two exhibits into one agreement called a "Declaration of Covenants, Conditions, Restrictions, and Easements" ("CCR"):

> This document is meant to cover the subject areas defined in the AMREC Agreement as Exhibits F and H. As I previously discussed with you, upon reflection in drafting this document we thought it best to cover subject matters contemplated by Exhibits F and H in this one document. This will necessitate of course, an addendum to the AMREC Agreement.

(Ex. 23 to BMW's Memorandum.)   There is no signed writing in the record embodying agreement to the  combined document Rosen's attorney proposed, nor is there any "addendum" to reflect some other agreement.

After May 1, 2002, AMREC Attorney John Campbell's office caused a binder of the existing agreements to be assembled and, on May 8, 2002, sent the binder to Rosen's attorneys.  Campbell's staff created lettered tabs for each Exhibit required by the April 2002 Agreement, and a cover sheet for each such Exhibit. Behind the cover sheet for Exhibit G, they placed an artistic rendering of the entire site which had no designation of parcels.  Behind the tabs for Exhibits F and H, they placed a sheet that contained the words "NOT USED."  (Ex. 28 to BMW's

Memorandum.)  The sheets of paper that said "NOT USED" were not presented to any party as a contractual document, nor signed.

The record reflects that Rosen's attorneys immediately began revising the agreements as early as May 2, 2002.  As early as May 7, 2002, Rosen's attorneys began creating a revised "Amended and Restated Master Agreement" which reflected the conversion of Exhibits F and H to a CCR. (Atlass Dep. p. 58-59, Ex. 25 to BMW's Memorandum; Abbott Dep. p. 41, Ex. 24 to BMW's Memorandum.) It is undisputed that the parties did not sign a CCR or any other document purporting to agree to a CCR at that time.  Indeed, the record reflects an ongoing state of negotiation and revision of the various documents.

The License Agreement between AMREC and CR-MERC, which governs the use of the Clemson trademark, was contingent upon the existence of an agreed CCR (the subject matter of Exhibits F and H).   Schedule 4 of the License Agreement[2] indicates "[t]he development of the Campus shall not deviate from the requirements of the Declaration of Covenants, Conditions, Restrictions, and Easements" (*i.e.* the CCR).  (Ex. 30 to BMW's Memorandum.) Section 12(p) of the License Agreement provided it could be terminated if the parties did not include certain protective provisions in the CCR.[3]  *Id.*

---

[2]

 The Clemson trademark was licensed to Rosen through two companion agreements: (1) an agreement between Clemson University and AMREC, and (2) an agreement between AMREC and CR-MERC.  The relevant provisions discussed herein appear in both agreements.

[3]

While Rosen, AMREC, and Clemson were working on the various agreements, State legislative developments opened up a political funding avenue for the GEC being discussed separately between BMW and Clemson.  On May 15, 2002, the State General Obligation Economic Development Bond Act (the "Bond Act") was passed.  S.C. Code Ann. §11-41-10 *et. seq*.  The Bond Act allowed the State to fund infrastructure projects that would support identified economic development in South Carolina.  BMW proposed to make a major investment in South Carolina and identified the GEC as one of the infrastructure projects to potentially receive funding under the Bond Act.  As a precursor to State bond funding, the Bond Act requires BMW (the "sponsor") to invest $400 million and create 400 jobs in South Carolina (the "economic development project").  S.C. Code Ann. §11-41-30.  Upon this condition, the State may pay for "infrastructure" that "must relate specifically to, but is not required to be located at, the economic development project." *Id.*  The proposed infrastructure project must be approved by the Secretary of Commerce, the Joint Bond Review Committee and the State Budget and Control Board (which is chaired by the Governor).  *Id*.  BMW and the State negotiated in the Summer of 2002 on State financial support for the BMW initiative; by July 29, 2002, Secretary Way had formally proposed BMW incentives

---

 In his affidavit, Rosen attorney Eliot Abbott states that this requirement was a "non-issue" because the required language appeared in the many drafts of the CCR, and in the absence of Exhibit F the language of Paragraph 4 of the April 4, 2002 Agreement would restrict the use of the property.  (Elliott Aff. ¶¶ 9-11)  However, Paragraph 4 only discusses restrictions on the AMREC campus; Paragraph 6 requires an agreement which will "govern the use" of the adjoining land retained by CR-MERC, but provides no substantive language about what could or could not be built on the non-Clemson, non-AMREC portion of the land.  (Ex. 17 to BMW's Memorandum.)  Moreover, the License Agreement refers to an operative CCR, not a draft.

funded by bonds, which included $25 million earmarked for Clemson for a "graduate automotive engineering education and training center." (Ex. 32 to BMW's Memorandum.)

After the passage of the Bond Act, Rosen lobbied the State to fund the wind tunnel project. Rosen met with Governor Hodges in the Summer of 2002. On June 24, 2002, Rosen and his attorneys met with Dr. Jim Morris, Chief of Staff at the South Carolina Department of Commerce ("SCDOC"). At that meeting, Rosen sought State funding for the wind tunnel. Dr. Morris told Rosen that the State would not fund a wind tunnel, and that the SCDOC was instead considering funding the GEC. After learning this, Rosen sought to secure the funded GEC for his site. On July 1, 2002, Rosen wrote Dr. Przirembel of Clemson that "[m]y meeting with Commerce has convinced me that it will be useful to begin the process of designing and developing Clemson's new graduate education facility." (Ex. 37 to BMW's Memorandum.) Rosen asked Dr. Przirembel for a written commitment for the GEC to be located on his site. The record reveals that there was no obligation by Clemson, BMW or the State to locate the GEC on the Hollingsworth Property, or even to create the GEC.

In July 2002, BMW began discussions with Clemson about a site for the GEC. On July 19, 2002, BMW learned that Clemson was proposing an off campus site, the Hollingsworth Property controlled by Rosen, for consideration as the site for the GEC. Shortly thereafter, Rosen sought to convince BMW that it should locate on the Hollingsworth Property. On or about July 30, 2002, Rosen's

representative Bill Thompson hosted Craig Arnold of BMW at a meeting, which Thompson described as a "pitch" to BMW.  (Thompson Dep. p. 38-39, Ex. 43 to BMW's Memorandum.)  Thompson testified that he viewed BMW as a potential anchor tenant for the development, and that "you listen to what the anchor tenant has to say.  You may not do it, you may negotiate about what the terms are, but you listen."  (Thompson Dep. p.29, Ex. 43 to BMW's Memorandum.)  At the meeting, Arnold told Thompson that the GEC could be located on the main Clemson campus and asked about other available land in the area. Thompson knew that the negotiations to follow the July meeting with Arnold were intended to address whether the GEC would go on the parcel that Rosen then controlled:

> Q:    And Mr. Thompson, that was an issue that began that day and continued throughout the negotiations[,] wasn't it?  Are we going to locate it on this property or is there other land available where we can put this school?

> A:    That was always Clemson's option.

(Thompson Dep. p.51, Ex. 43 to BMW's Memorandum.)  Thompson told BMW to address its concerns about the GEC directly with Clemson.  However, Arnold raised numerous issues directly to Thompson that BMW would repeatedly raise with Clemson during negotiations in the year to come, including:  (1) that the education function of the school was important to BMW as a potential source of engineers in South Carolina; (2) that the development next to the GEC should be consistent with a college campus environment, and not a "shopping center" (Thompson Dep. p.34-35, Ex. 43 to BMW's Memorandum); and (3) that the identified site might not be big enough.

Thompson and Arnold had discussions about the design standards for the proposed campus, the development fees, and the land restrictions. Thompson invited Arnold to review certain documents to address the issues Arnold had raised. After the meeting, Thompson sent Arnold a letter dated August 2, 2002 with a selection of the various documents.  There is no evidence in the record that BMW ever received the April 2002 Agreement or all of its then-existing Exhibits.  In his transmittal letter, Thompson said to Arnold:  "Based on our meeting it is apparent to me that my company must reflect a spirit of flexibility in order to meet BMW's needs."  (Ex. 44 to BMW's Memorandum.)  With both Rosen and Clemson having pitched the Hollingsworth Property as a potential site for the GEC, BMW turned towards discussions with the SCDOC and Clemson University regarding the conditions upon which the GEC would proceed to the next step of government approval under the Bond Act – certification by the Secretary of Commerce, approval by the Joint Bond Review Committee, and approval by the State Budget and Control Board.

The first major meeting after the Hollingsworth site had been formally pitched to BMW was on August 19, 2002.  The meeting was between numerous representatives of the SCDOC, Clemson, and BMW.  Prior to this meeting, Dr. Morris of the SCDOC stated that it was necessary to think of the State-funded GEC separately from the wind tunnel, and that "Rosen's name" should not appear on the Clemson campus, as the campus should reflect the State's involvement and funding.  (Leidinger Dep. p.46–49, Ex. 47 to BMW's Memorandum.)   At the

meeting, the BMW representatives raised numerous specific points, which related to the issue of separating the State-owned GEC (and its parcel) from the private development controlled by Rosen.  Towards this end, the participants discussed (1) how the relationship could be carried out between Clemson and BMW; (2) the necessary amount of acreage to fall under the control of Clemson University; (3) how the necessary control of the State-funded, Clemson-owned projects would be addressed with Rosen's ownership and development rights; and (4) whether the GEC should be located on another site or on the main campus of Clemson.  The Plaintiffs rely heavily on notes taken during this period of time for statements attributable to BMW, such as "There is no Miami Developer who is going to tell us what to do" and "Decouple Graduate Education Center sooner rather than later." (Exhibit 10 to Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment.)

After the meeting of August 19, 2002, Clemson's Przirembel began drafting a "Memorandum of Expectations between Clemson University and BMW."  (Exhibit 4 to Reply in Support of BMW's Motion for Summary Judgment.)  On August 26, a proposed draft was delivered to Carl Flesher of BMW.  Flesher returned it on September 13 with requested changes, including:  "Clemson University will use its best efforts to secure sole ownership and control, as soon as possible, of 100 or more buildable acres of land, unencumbered by extraneous development costs or fees."  (Ex. 20 to Plaintiffs' Memorandum in Opposition.)  The document went on to say "BMW will obtain $25M from the State of South Carolina through the

Department of Commerce to be used for the construction of [the GEC and] . . . BMW will provide a $10M endowment for the support of the operations of [the GEC]." *Id.* The document did not require any particular site for the GEC. Clemson gave BMW assurances that it would attempt to meet BMW's expectations. On September 26, 2002, the State of South Carolina, BMW, and Clemson publicly announced both the creation of the GEC and BMW's donation of $10 million to Clemson. The announcement did not make any reference to a selected site for the GEC.

Clemson began negotiating with Rosen for a "carve out" of a State-owned campus that would be totally within Clemson's control and not subject to any development rights or fees for Rosen. These discussions culminated in a meeting between Rosen and a subcommittee of the Clemson Board of Trustees, at which Rosen made a presentation regarding his "Response to Clemson regarding altering original agreement to accommodate requests by BMW and [Department of] Commerce." (Ex. 59 to BMW's Memorandum.) In essence, Rosen proposed to sell acreage at a higher price in exchange for removing his exclusive development rights.

The parties began to discuss individual parcels and prices for a contemplated closing in January 2003. It was during this series of negotiations that Rosen submitted to AMREC for the first time a proposed survey designating what part of the Hollingsworth Property would constitute the AMREC campus. Clemson objected to Rosen's proposal, claiming that up to one-half of Clemson's proposed

property would be "under water," and that other numerous features would affect the amount of buildable acres for future campus development. (Campbell Dep. p.194-196, Ex. 18 to BMW's Memorandum.)  In response, Rosen argued in an email dated December 14, 2002, that the proposal was a good deal for Clemson. He claimed that in return for a proposed $4.7 million investment by Clemson, Clemson would receive the $25 million GEC, BMW's $10 million endowment, and the $12 million dollar, State-funded road that was proposed for the property. Rosen concluded his response by inviting Clemson to ask itself: "Can the acquisition of the total 40 acres be replaced with a more favorable transaction?" (Ex. 62 to BMW's Memorandum.)

In November 2002, Mark Sanford won the South Carolina gubernatorial election, defeating incumbent Governor Jim Hodges.  On December 12, 2002, the parties met with Governor Sanford to solicit his support.  President Barker described the meeting and its significance:

> The meeting took place in Columbia.  Involved were Cliff Rosen, Chris Przirembel, folks in the Department of Commerce.  I think Jim Morris was there. . . . I had met [Governor Sanford] before that but it was an effort to explain the basic concept of the project[,] what role Clemson would play in it, what role BMW would play in it[,] what role the Cliff Rosen would play in it and I thought the meeting was going very well. And then there was a question the Governor asked. It may have been the first question.  I do not remember but the question was directly to Cliff Rosen what do you have in this project[?]  What is your role in this project[?]  What was your financial commitment to this project[?] And I remember being absolutely shocked at the idea that he did not really respond to that question.  And all I wanted him to say was Governor we are going to commit to building this wind tunnel[,] financing it[,] giving the land to Clemson and that is our financial commitment to this project and he did not do that. . . . He did not say that he was committed to this project and the financing of the wind

tunnel.  And I remember the meeting having a completely different tone after that.

(Barker Dep. 55-57, Ex. 2 to BMW's Memorandum.)  Rosen states in his affidavit that he told Governor Sanford "I had $5 million invested with up to $25 million to be invested by way of cash and additional guarantees on mortgages as I exercised my options under the Hollingsworth Agreements."  (Rosen Aff. ¶ 17, Ex. 40 to Plaintiffs' Memorandum in Opposition.)  Governor Sanford testified that he was concerned about "how you'd have at some level State money going into something but no transparency as to whether or not that was indeed a good deal or a bad deal."  (Sanford Dep. pp.15-16, Ex. 65 to BMW's Memorandum.)  Governor Sanford asked Bob Faith, his nominee for Secretary of Commerce who was an experienced real estate developer, to investigate the deal further to make sure that there was sufficient value for the State.

Rosen's failure to mention the wind tunnel in his response to the Governor's questions began to concern Clemson that Rosen would not deliver a wind tunnel. The record reveals that progress on the wind tunnel began to be an issue during this timeframe.  On December 3, 2002, Rosen sent his subcontractor MTS an order to "cease and desist from any work in connection with the Rolling Road System [for the wind tunnel] until further notice."  (Ex. 66 to BMW's Memorandum.) According to Clemson representatives, Rosen told them in a meeting on January 10, 2003 that "he was not going to be able to transact the . . . wind tunnel at this time because of a series of complexities[.]"  (Richardson Dep. p.226–229, Ex. 16 to BMW's Memorandum.)  This meeting became heated and the Clemson

14

representatives became upset.  No one from BMW was present at this meeting. Rosen says in his affidavit that "I never told President Barker, Dr. Przirembel, Dwight Drake, or anyone else that I would not or could not build the wind tunnel." (Rosen Aff. ¶ 5, Ex. 40 to Plaintiffs' Memorandum in Opposition.)  Rosen states that instead, "I simply maintained that I would not unconditionally guarantee its construction or financing." *Id.*

Rosen's position on the wind tunnel culminated in a letter to Clemson that he wrote on January 21, 2003.  In his letter, Rosen acknowledged that "Clemson perceives that my organization has not fulfilled its commitment to build the Wind Tunnel." (Ex. 43 to Plaintiffs' Memorandum in Opposition.)  Rosen indicated that the viability of the wind tunnel project was in doubt and blamed Clemson for the lack of progress on the wind tunnel.  Rosen claimed that Clemson had a duty to obtain "pre-sales" for wind tunnel time from the racing teams before he would proceed further on the wind tunnel.  *Id.*  Without Clemson providing these presales, Rosen stated that the "financial viability [of the wind tunnel] is unknown."  *Id.* Rosen wrote "the current status of the 'Wind Tunnel['] is not a result of any action or lack thereof by my organization."  *Id.*  Rosen also touted the involvement of BMW and the GEC as "miraculous strides," and suggested that BMW's involvement "should help you alleviate some concerns relating to the slow progress on the commencement of construction of the Wind Tunnel."  *Id.*

According to President Barker, "it became pretty clear . . . that the person that we had counted on to make this wind tunnel a reality was saying he was not

going to do that so it had a major impact on all of us here." (Barker Dep. p.65-67, Ex. 2 to BMW's Memorandum.) President Barker testified that Rosen's wind tunnel letter put the parties "back to square one" in the negotiation process. *Id.* According to Clemson Trustee Bill Amick, once Rosen took the wind tunnel "off the table," the deal would have to be renegotiated to reflect the lost value. (Amick Dep. p.119, Ex. 58 to BMW's Memorandum.) Rosen wrote President Barker on February 24, 2003 "to rectify the doubt created through the correspondence related to the Wind Tunnel," and to "apologize for the negative impact that it created." (Ex. 52A to Plaintiffs' Memorandum in Opposition.) Rosen labeled his earlier letter as the "infamous wind tunnel letter," and promised that his company would "never stop until it has, at one point or another, completed the Wind Tunnel component of this project." *Id.*

On March 12, 2003, President Barker responded to Rosen's "infamous wind tunnel letter." Plaintiffs contend that President Barker's letter comprises a repudiation amounting to breach of contract, and the relevant portion of the letter states:

> Everyone understood from the beginning that this was an extremely complex project, with a multitude of issues to be addressed. Likewise, it has always been understood that final agreement between the parties would not occur until all these issues were resolved. Indeed, the Agreement executed by the parties on April 4, 2002 states clearly in Section 10 that any party may cancel the Agreement any time after May 1, 2002 if AMREC and CR-MERC are unable to agree on any of the exhibits. The current status is that a number of exhibits have never been completed because the parties have not been able to agree on their contents. While other exhibits have been executed, the parties have now reopened discussion on them, once again making them incomplete. Accordingly, the April 4, 2002 Agreement functioned as

16

> little more than a letter of intent, whose deadline for formal agreement has passed. Accordingly, the parties have since May 1, 2002, been moving forward on the hope that the Project could come to fruition, but understanding all along that much remained to be done before any "partnership" or other understanding is formalized.

(Ex. 97 to Plaintiffs' Memorandum in Opposition.)  President Barker then countered Rosen's allegation that Clemson was responsible for obtaining presales.  President Barker contended that from the outset, Rosen had agreed to take full responsibility for the financing and building of the wind tunnel; President Barker asked: "[w]hat is the attraction to Clemson of a donation by you of the Wind Tunnel . . . if Clemson must be responsible for its financing?" *Id.*    President Barker then requested assurances that Rosen still intended to build the wind tunnel:

> In the beginning, you gave the impression to Clemson that you had the resources necessary to provide the foundation for meeting the Wind Tunnel's development costs. If you now feel you cannot deliver on the Wind Tunnel, or are dependent on Clemson for its financing, then it is past time for saying so.  Although Clemson still wishes to partner with you, we need to know if it must go it alone on the Wind Tunnel's development.

*Id.*

President Barker testified that BMW had no involvement in the preparation of the letter.  There is no evidence to the contrary.  Rosen never wrote a response to President Barker's letter of March 12.  Plaintiffs also point to a later letter dated May 13, 2003 to Bill Thompson from Neil Cameron, Vice President for Advancement at Clemson.  Cameron expressly refers Thompson to President Barker's letter of March 12, repeats the statement that all of the exhibits were not completed, and says "[a]s there is currently no agreement, nothing will be

17

amended.  Clemson is, however, interested in continuing discussions to determine common interests between the parties, and whether the Project can go forward to the satisfaction of both parties."    (Ex. 126 to Plaintiffs' Memorandum in Opposition.)

At the same time that Rosen and Clemson were corresponding about their respective commitments to the wind tunnel, the Governor was undertaking his review of the project.  On January 9, 2003, Secretary Faith met with Rosen, Clemson, and BMW to discuss the project.  Secretary Faith confirmed Governor Sanford's initial concern over the balance of the project.  On January 10, 2003, Governor Sanford asked the parties to delay their announcement plans for sixty (60) days so that Secretary Faith could make a more thorough review of the project.

On February 19, 2003, Secretary Faith met with representatives of Clemson to discuss the project.  At this meeting, Clemson took the position that it did not have a deal with Rosen.  Clemson informed Secretary Faith about the termination provision of the April 2002 Agreement and explained that all of the Exhibits to the April 2002 Agreement had not been completed.  BMW was not involved in this meeting and did not have any input into the development of Clemson's position.  On February 20, 2003, the day after Secretary Faith met with Clemson representatives, Governor Sanford met with key officials from Clemson, Rosen, BMW and the City of Greenville, and thereafter held a press conference in Greenville, saying, "If you have the Clemson franchise you couldn't put a Wal-Mart

or Motel Six as part of it, and I think that is very important.  The other is the actual structure of the deal.  What are you putting in, and what am I putting.  To date, that hasn't been resolved. . . . It will be a very healthy tug of war and negotiating process."  (Ex. 105 to BMW's Memorandum.)  Governor Sanford told the *Greenville News* that "we're not committed to this developer or this site."  (Ex. 104 to BMW's Memorandum.)  On March 3, 2003, Secretary Faith told Gordon Dill of WYFF News:  "The deal is not done . . . .  If the state is going to commit $52 million, what's the state going to see for that? . . . (The money) has not been spent yet . . . .  It has not been decided where the grad school of engineering is going to go."  (Ex. 106 to BMW's Memorandum.)

One of the aspects of the project that was questioned by Secretary Faith was the proposed $12 million road through the Hollingsworth Property (the "Road").  In August 2002, the State Infrastructure Bank ("SIB"), which was headed by Champ Covington, approved a measure to reimburse the City of Greenville for the costs of the Road.  The vote on this measure was contested, and passed by a 4-3 margin. [4]  Among the Board members voting in favor of the Road was Max Metcalf, a BMW employee who serves on the SIB Board.  The Plaintiffs contend

---

[4]  On January 15, 2003, Rosen, the City of Greenville, and Champ Covington signed the Intergovernmental Agreement ("IGA") formalizing the SIB's funding obligation.  Rosen's entity, BCD, LLC, entered into only the "Joinder of Developer for Limited Purpose" provision, which set forth Rosen's obligation to establish a research park in the development.  (Exhibit 75 to BMW's Memorandum.)  Section 10.2 of the IGA makes clear that Rosen had no rights under the agreement – it was an intergovernmental agreement entered into "for the sole protection and benefit of the Bank and the City," providing that "[n]o other . . . parties shall, under any circumstances, be deemed to be a beneficiary of any conditions or obligations[.]" *Id.*  While Plaintiffs rely heavily upon the Road in the First Amended Complaint and their memorandum, the First  Amended Complaint does not allege that the Road contracts were breached.

that Max Metcalf should have recognized a BMW connection to the Road, and should have abstained from the vote.  Governor Sanford and Secretary Faith first became concerned about the Road funding issue based upon conversations Governor Sanford had with Senator Greg Ryberg.  Senator Ryberg is a member of the SIB Board who had voted against the proposal and was "very very upset with the way that these funds were being used . . . ."  (Sanford Dep. p.37–p.38, Ex. 65 to BMW's Memorandum.)  In his affidavit, Senator Ryberg testified that he opposed Covington at every turn.

After familiarizing himself with the details, Secretary Faith determined that the deal being negotiated between Rosen and Clemson was not fair for the State.  He determined that fundamental changes to the project would have to be made before State-funded assets would be committed to the project.  If a new deal could not be reached, Secretary Faith was prepared to locate the GEC on an alternate site.  Secretary Faith informed Rosen of his position and that Faith was willing to tie the matter up in litigation if necessary.[5]

Meanwhile, negotiations between Clemson and Rosen continued.  In his "infamous wind tunnel letter," Rosen had requested that Clemson "identify a

---

[5]  In addition to the issue of whether the State was obligated to pay for a road through a wholly private development, there were also issues regarding the City's progress in completing the conditions precedent to SIB funding under the IGA.  Through its attorney Jim Holly, the SIB took the position that the SCDOT had not approved the road system, the requisite permits were not in place, and that all of the requisite easements or dedications had not been obtained.  The affidavits of Jim Holly and Rosen attorney Larry Estridge present different arguments as to whether the necessary and sufficient easements or dedications had been supplied; however, neither attorney addresses the SCDOT approval or the permits in their arguments.

Clemson point person to be authorized to negotiate a transaction" with Rosen.  (Ex. 43 to Plaintiffs' Memorandum in Opposition.)   President Barker asked Clemson University Trustee Bill Smith, who is a real estate developer, to serve as the point person for Clemson in the negotiations.   Barker also asked the other Clemson representatives to make sure that future conversations with Rosen take place at the negotiating table.   Upon entering the negotiations, Trustee Smith asked Rosen to make a firm commitment to build the wind tunnel.   Rosen did not satisfy Trustee Smith, and Trustee Smith became convinced "that the wind tunnel was an uncertainty, and that any proposed deal should have sufficient value to justify it on the real estate terms alone."   (Smith Aff. ¶7, Ex. 78 to BMW's Memorandum.) Rosen states in his affidavit that he viewed the Clemson officials as trying to obtain a "guarantee" on the wind tunnel, and Rosen testifies he consistently would not give one and was not required to give one.   (Rosen Aff. ¶¶ 5, 11, Ex. 40 to Plaintiffs' Memorandum in Opposition.)

On March 24, 2003, Smith emailed Rosen a new proposed deal structure with two alternatives entitled "Option A" and "Option B."   (Ex. 80 to BMW's Memorandum.)   Option A proposed that the GEC, which was not subject to the April 2002 Agreement, would be located upon the Hollingsworth Property.   In return, Option A proposed that Rosen would lower some of the prices that AMREC would pay to acquire property for its campus and Rosen would also provide assurance that he was building the wind tunnel by agreeing to a $5 million escrow, which would be forfeited if Rosen did not achieve specified benchmarks towards

the wind tunnel construction. Option B also proposed that the GEC would be located on the Hollingsworth Property, but it assumed that Rosen was not building the wind tunnel. To make up this value, Option B required Rosen to donate additional land to AMREC.

In April 2003, Rosen made a counterproposal to Clemson. Under his counterproposal, Rosen proposed to donate some additional land to Clemson in return for Clemson and BMW agreeing to locate the GEC on the Hollingsworth Property. However, Rosen's proposal did not provide a firm commitment on the wind tunnel. Instead, Rosen offered to donate five (5) additional acres if he did not build the wind tunnel by 2006. Rosen's proposal pushed the deadline for beginning design of the wind tunnel to 2004. Rosen's proposal would also have made BMW a party to an agreement and placed an obligation on BMW to assist Rosen in marketing the site.

Rosen's counter-proposal was not acceptable to Clemson. As a result, Clemson determined that it must move on and find a different site for the GEC (an option sometimes informally referred to as "Option C"[6]). On April 26, 2003, the Clemson University Board of Trustees passed a resolution that read:

> The Clemson University Board of Trustees supports the development of the Clemson International Center for Automotive Research in a site to be determined in the greater Greenville area, and charges the Clemson University Administration to move forward as expeditiously as possible.

(Ex. 82 to BMW's Memorandum.)

---

[6] Przirembel Dep. p. 106, Ex. 1 to BMW's Memorandum.

Consistent with the directive given by the Clemson Board of Trustees in the April 26 Resolution, the Clemson administration began to shift its focus towards acquiring land off Verdae Boulevard that was also owned by the Hollingsworth interests.  The record is clear that by this time BMW representatives were also in favor of finding another site for the GEC, including advocating for a purchase of the Verdae property.  In June 2003, Clemson and the SCDOC began having discussions and correspondence with the Hollingsworth organization.  The efforts to obtain another site were known to Rosen; his key representative Bill Thompson told the *Greenville News* "[t]he state and Clemson have been telling us for months . . . they've been looking at other sites. . . . Nothing ever happens.  We're going ahead."  (Thompson Dep. p.178, Ex. 43 to BMW's Memorandum.)

In June 2003, negotiations between Clemson and Rosen were renewed under a different deal structure and continued at a protracted pace.  On August 14, 2003, Rosen's attorneys prepared an initial draft of the Real Estate Purchase and Sale Agreement that would constitute the framework for the new deal that was being finalized by Clemson and Rosen.  On October 6, 2003, CUREF and Rosen executed the Real Estate Purchase and Sale Agreement (the "October 2003 Agreement").  The October 2003 Agreement is the "final" agreement that provided for the sale of land for the new campus, and addressed all outstanding subject areas.  Section 6.13 of the October 2003 Agreement provides that the earlier April 2002 Agreement and its Exhibits were "terminated for all purposes without any liabilities to any of the parties[.]"  (Ex. 89 to BMW's Memorandum.)  The October

2003 Agreement gave Clemson the right to acquire 250 acres of the 407 acre parcel without any development rights or fees for Rosen.  The October 2003 Agreement specifically identified each parcel going to Clemson.  Attached to the agreement was the final CCR agreed upon by the parties covering both Clemson's and Rosen's portion of the park.

On the day the October 2003 Agreement was executed, Rosen told the *Greenville News* "I'm pleased with the final deal."  (Ex. 90 to BMW's Memorandum.)  As an agreed part of the transaction, Rosen took over $44 million in charitable tax deductions for the land transactions governed by the October 2003 Agreement.  The land Rosen retained in the final transaction adjoins the site of the GEC, which together with its surrounding campus is now known as "CU-ICAR," which stands for the "Clemson University International Center for Automotive Research."

## II.  STANDARD

Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.  A genuine issue of material fact is raised only if a reasonable jury could return a verdict for Plaintiffs on each element necessary to their case. *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1027 (4th Cir. 1997).  In ruling upon a summary judgment motion, the Court is to consider only evidence that would be admissible at trial.  *Maryland Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1251-52 (4th Cir.

1991).    Affidavits opposing a motion for summary judgment are not to be considered to the extent that they contain hearsay or contain statements that are not based upon personal knowledge.    *Minnesota Mining & Mfg. Co. v. United States Rubber Co.*, 279 F.2d 409, 415-16 (4th Cir. 1960).

Under Rule 56, the Court must construe the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).    However, the non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."    *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Unsupported allegations and conclusions "do not confer talismanic immunity from Rule 56." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).

## III.  ANALYSIS

Plaintiffs have asserted three causes of action against BMW: (1) tortious interference with existing contract; (2) tortious interference with prospective contract; and (3) civil conspiracy.  The Court finds that summary judgment in favor of BMW is appropriate on all causes of action.

A.    *Noerr-Pennington Doctrine*

The *Noerr-Pennington* doctrine provides BMW with a complete defense to all causes of action.  The First Amendment to the Constitution of the United States guarantees the right to petition the government for redress.  *See City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 379 (1991).  The *Noerr-Pennington*

doctrine protects this right by immunizing parties from liability for efforts to seek relief from the government. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140-141 (1961); *A Fisherman's Best, Inc. v. Rec. Fishing Alliance*, 310 F.3d 183, 189-191 (4th Cir. 2002). The actor's motivation for trying to influence the government is irrelevant, as *Noerr-Pennington* protects any "concerted effort to influence public officials regardless of intent or purpose." *City of Columbia*, 499 U.S. at 379 (internal quotes omitted). The immunity applies even if the means employed "can be termed unethical." *Noerr*, 365 U.S. at 140-141. *Noerr-Pennington* immunity also protects requests that would lead "public officials to take official action that will harm or eliminate competition." *Savage v. Waste Management, Inc.*, 623 F. Supp. 1505, 1513 (D.S.C. 1985) (internal quotes omitted).

The *Noerr-Pennington* doctrine protects attempts to influence virtually all types of governmental entities, including the executive branch of government, municipalities, and public universities. *See id.* (applying the doctrine to executive, legislative, and municipal actions); *Gunderson v. University of Alaska*, 922 P.2d 229 (Alaska 1996) (applying the doctrine to a public university); S.C. Code Ann. § 15-78-30 (defining the "State" as "the State of South Carolina and any of its . . . schools, colleges, universities, and technical colleges"); S.C. Code Ann. § 8-1-10 (defining Clemson's Trustees as "public officers" of the State).

While the Noerr-Pennington doctrine was "originally developed in the antitrust context, the doctrine  has now universally been applied to business torts,"

26

including tortious interference. *IGEN Int'l, Inc. v. Roche Diagnostics GMBH*, 335 F.3d 303, 310 (4th Cir. 2003). The doctrine also applies to conspiracy claims. *City of Columbia*, 499 U.S. at 383. Application of the *Noerr-Pennington* doctrine is a question of law for the Court to decide. *IGEN Int'l, Inc.*, 335 F.3d at 310.

1.    *Application of Noerr-Pennington*

The *Noerr-Pennington* doctrine is applicable to Plaintiffs' claims against BMW. Plaintiffs have alleged that BMW conspired with numerous State officials and Clemson to interfere with Rosen's contractual rights to the benefit of BMW and Clemson. These allegations are similar to the claims asserted in *A Fisherman's Best.*, 310 F.3d at 189-191. As in that case, the allegations against BMW are incidental to BMW's First Amendment right to petition and are therefore protected. Plaintiffs rely extensively upon allegations regarding the actions of governmental actors such as Governor Mark Sanford, Secretary of Commerce Bob Faith, and Clemson President James Barker. Even assuming these allegations are true, this behavior would constitute protected First Amendment conduct under the above cited authority. As such, BMW would be entitled to *Noerr-Pennington* protection under the most generous interpretation of Plaintiffs' theory of liability and the evidence.

Plaintiffs argue on pages 2-3 of their Memorandum in Opposition that summary judgment is not appropriate on the *Noerr-Pennington* doctrine because AMREC is a "private entity" and "[a] jury issue concerning BMW's interference is presented by the overwhelming evidence of what were at times multiple daily

contacts between BMW and AMREC." Plaintiffs misstate the legal standard. The application of *Noerr-Pennington* is a question of law for the Court to decide. The relevant test for determining whether the existence of a private entity in a transaction destroys *Noerr-Pennington* immunity is whether the private activity is "independent of any government action" and is not "'incidental' to a valid effort to influence governmental action." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). Given Plaintiffs' extensive reliance upon the activities of governmental actors and the undisputed fact that BMW's involvement in the transaction stemmed from its agreement to sponsor the State-funded GEC, Plaintiffs cannot demonstrate that the interactions between BMW and AMREC (or any other private actor) were independent of and not incidental to any governmental action. As such, BMW is entitled to *Noerr-Pennington* immunity, and summary judgment is appropriate on all causes of action on that ground alone.

*2.    Sham Exception*

To avoid the application of the *Noerr-Pennington* doctrine, Plaintiffs ask the Court to find the existence of an exception to the doctrine in this case. Plaintiffs argue that *Noerr-Pennington* does not apply to conduct that is "overtly corrupt." (Plaintiffs' Memorandum in Opposition, p. 11.)    While not acknowledged in Plaintiffs' memorandum, the sham exception is the only recognized exception to the *Noerr-Pennington* doctrine. *See A Fisherman's Best, Inc.*, 310 F.3d at 189-191; *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785 (2nd Cir. 1983). The Court finds that BMW did not engage in a sham petition of the

government.

The sham exception applies where a party does not have a genuine interest in influencing governmental action, but instead utilizes the governmental process, without a realistic hope of success, for the purpose of harassing a competitor. *See A Fisherman's Best, Inc.*, 310 F.3d at 191. For example, the filing of a frivolous lawsuit to delay a competitor from bringing a product to market would constitute a sham. *Id.* Activity is a sham only if the actor is interested in the process and not the outcome. The sham exception does not apply if the actor actually hopes to achieve some affirmative result from the governmental entity. As the Fourth Circuit has noted, a "successful effort to influence governmental action certainly cannot be characterized as a sham." *Id.* (internal quotes omitted). Plaintiffs cannot meet this standard, as their claims are predicated upon the assertion that BMW successfully influenced governmental actors to take actions harmful to Plaintiffs.

For instance, Plaintiffs allege that BMW influenced the State to force Rosen to surrender his rights to a large portion of the Hollingsworth Property so that BMW could locate the GEC and other research functions on the site. The fruition of the GEC and the "success" of BMW's alleged plan to separate Rosen from the property he controlled belies any argument that BMW's activities were a sham.

Moreover, Plaintiffs' attempt to avoid the preclusive effects of the October 2003 Agreement, which expressly terminates "for all purposes" the contract underlying Plaintiffs' claims, by contending that Rosen entered the October 2003 Agreement under duress. (Ex. 89 to BMW's Memorandum.) This argument

necessarily relies upon the assertion that BMW was successful in petitioning the State to apply pressure to Rosen. Plaintiffs' repeated reliance upon BMW's alleged successful petitioning of governmental actors cannot be reconciled with an argument that BMW's efforts were in any sense a sham.

While not directly arguing that BMW's conduct was a sham, Plaintiffs rely upon sham exception cases to assert that the *Noerr-Pennington* doctrine does not apply to conduct that is "overtly corrupt." (Plaintiffs' Memorandum in Opposition, p. 11.) To support this assertion, Plaintiffs rely upon *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972), and its progeny. *California Motor Transport* is readily distinguishable from the facts of this case. First, *California Motor Transport* is a sham exception case. *City of Columbia*, 499 U.S. at 381-82. For the reasons discussed above, Plaintiffs have not established that BMW's activities were a sham.

Second, the holding in *California Motor Transport* is limited to attempts to deny a party's access to the courts or other adjudicatory tribunals. 404 U.S. at 511-12 (noting that the "allegations are not that the conspirators sought 'to influence public officials,' but that they sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process"). The discussion of corrupt conduct in *California Motor Transport* was limited to whether behavior such as perjury and bribery had the effect of barring one's access to the Courts. As the Court noted, "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."

30

*Id.* at 513.   There is no allegation in this case that BMW filed a lawsuit or administrative proceeding against Rosen or that BMW denied Rosen access to any court or similar tribunal.  This fact alone renders *California Motor Transport* and its progeny inapplicable to this case.

All of the allegations regarding BMW's attempts to petition governmental actors involve classic political activity.  The *City of Columbia* Court reaffirmed the broad application of *Noerr-Pennington* in these situations:

> Few governmental actions are immune from the charge that they are "not in the public interest" or in some sense "corrupt.". . . Any lobbyist or applicant, in addition to getting himself heard, seeks by procedural and other means to get his opponent ignored.

499 U.S. at 377-82.   This language directly refutes the notion that there is a general "corruption" exception to the *Noerr-Pennington* doctrine.   Allegations of corruption are only relevant to the determination of whether the petitioner's activities were a sham, and even then only to the extent that such conduct has barred one's access to the courts or other similar governmental tribunals.

Even assuming that such a broad "corruption" exception does exist, Plaintiffs have not put forth any evidence that BMW in fact engaged in any illegal or corrupt conduct.  The closest Plaintiffs come are the following allegations: (1) that Governor Mark Sanford "threatened" Greenville Mayor Knox White that he might move the project out of Greenville (Plaintiffs' Memorandum in Opposition, p. 4); (2) that Secretary of Commerce Bob Faith "threatened" Greenville City Councilman Gary Coulter with political payback if he did not go along with the Governor's wishes

(Plaintiffs' Memorandum in Opposition, p. 3, 26);[7] and (3) that BMW employee and SIB board member Max Metcalf had a conflict of interest when he voted to approve the Road.  The allegations regarding Governor Sanford and Secretary Faith, which are addressed in detail below, are irrelevant for *Noerr-Pennington* purposes, as the *Noerr-Pennington* analysis focuses on the actions of the petitioner rather than on the actions of the governmental actors being petitioned.  *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n*, 663 F.2d 253, 266 (D.C. Cir. 1981); *see also A.D. Bedell Wholesale Company, Inc. v. Philip Morris Inc.*, 263 F.3d 239, 255 n.34 (3d Cir. 2001)(internal quotes omitted)(noting that the right to petition would be "considerably chilled" if the petitioner was required to predict whether the governmental actor would engage in unconstitutional activities).  There is no evidence BMW threatened anyone or otherwise engaged in a corrupt manner.

Moreover, Plaintiffs have not cited any legal authority for the assertion that Metcalf's service on the SIB board automatically vitiates *Noerr-Pennington* immunity.  More importantly, their allegations of a conflict of interest are irrelevant – as the undisputed evidence is that Metcalf acted entirely consistent with Rosen's objectives by voting for the Road.  It is undisputed that the Road was important to Rosen and that Metcalf voted for the Road; indeed, Plaintiffs label Metcalf the "deciding vote."  (Plaintiffs' Memorandum in Opposition, p.41.)  Given the importance of the Road to Plaintiffs, they cannot claim any actionable harm resulting from Metcalf's vote to fund the Road.  Similarly, Plaintiffs argue on page

---

[7]   Plaintiffs also discuss a phone call between BMW employee Bobby Hitt and Councilman Coulter, but there is no indication of any threat or "corrupt conduct" by Hitt on this call.

9 of their Memorandum in Opposition that "[t]he inference may be drawn that Max Metcalf played a role in halting the road funds."  Plaintiffs have not submitted sufficient evidence to support such an inference, and it is contrary to the undisputed evidence regarding Metcalf's role.  Even if Plaintiffs had demonstrated such a connection to Metcalf, Plaintiffs have not met their burden of establishing that Metcalf's role on the SIB rendered BMW's entire involvement in the transaction a sham.  BMW is entitled to *Noerr-Pennington* immunity as to all causes of action asserted by Plaintiffs.

B.     *Tortious Interference with Contract*

The elements of a cause of action for tortious interference with contract under South Carolina law are: (1) the existence of the contract; (2) the other party's knowledge of the contract; (3) the other party's intentional procurement of the breach of the contract; (4) the absence of justification; and (5) resulting damage.  *Webb v. Elrod*, 418 S.E.2d 559, 561 (S.C. Ct. App. 1992).

1.     *Existence of a Contract*

A cause of action for tortious interference "presupposes the existence of a valid, enforceable contract."  *Jackson v. Bi-Lo Stores, Inc.*, 437 S.E.2d 168, 171 (S.C. Ct. App. 1993).  The Court finds that Plaintiffs have not created a genuine issue of material fact on the essential element of the existence of a contract.

a.     *The October 2003 Agreement*

Plaintiffs base their tortious interference claim upon the April 2002

Agreement, along with certain Exhibits thereto.[8]   It is undisputed that the April 2002 Agreement, which is the agreement Plaintiffs allege to have been breached, was expressly terminated in the October 2003 Agreement signed by Rosen.   The Fourth Circuit has held that under the doctrine of quasi-estoppel, a party cannot accept or retain the benefits of a transaction (*e.g.* the October 2003 Agreement) and take a position inconsistent therewith.   *In re Robb*, 23 F.3d 895, 898-899 (4th Cir. 1994).   The Fourth Circuit has recognized that quasi-estoppel applies where a party enters a second contract and then later attempts to assert rights under a prior agreement.   *National Manufacture & Stores Corp. v. Whitman*, 93 F.2d 829, 831-832 (4th Cir. 1938) (applying South Carolina law and noting that if a party "had any such rights [under the first contract], and desired to maintain them, he should have abstained from putting himself in a position where he voluntarily took advantage of the second opportunity to secure the work").   Given Rosen's decision to accept the benefits of the October 2003 Agreement, he is now estopped from asserting claims predicated upon a breach of the earlier, terminated April 2002

---

[8]  The First Amended Complaint identifies the following Exhibits to the April 2002 Agreement as having been breached: (1) the AMREC Campus Development Agreement; (2) the Wind Tunnel Development Agreement; (3) the AMREC Campus Management Agreement; and (4) the Wind Tunnel Management Agreement.   (1st Am. Compl. ¶¶ 170-173)   Notably, the license agreements and the Operating Agreement of WT, LLC are not identified as having been breached.   The First Amended Complaint does reference the Hollingsworth Contract in the first cause of action.   However, that agreement was between BCD and several Hollingsworth entities.   There is no allegation in the record that either BCD or the Hollingsworth entities breached the Hollingsworth Contract.

Agreement.[9] *Id.*; *see also Modern Enter., Inc. v. Allen,* 802 F.2d 312, 313 (8th Cir. 1986) (holding that a voluntary cancellation by the plaintiff cannot support the breach element of a tortious interference claim).

b.    *Duress*

To avoid the preclusive effect of the October 2003 Agreement, Plaintiffs rest upon the idea that Rosen entered this agreement under coercion or duress. However, Rosen testified that the execution of the October 2003 Agreement was voluntary.  Moreover, Plaintiffs are estopped from claiming duress.  Rosen's entities have taken over $44 million in charitable tax deductions resulting from the October 2003 Agreement. A key element of any charitable deduction is that it must be voluntary.  *See* 26 U.S.C. § 170; *United States v. American Bar Endowment*, 477 U.S. 105 (1987).   Having represented in their tax filings that the October 2003 Agreement was a voluntary transaction, Plaintiffs and Rosen are now estopped from arguing to the contrary.   Summary judgment is appropriate on this ground alone.  *See In re Breibert*, 325 B.R. 724, 727 (Bankr. D.S.C. 2004) (holding that "the Court need not inquire further and finds that Debtor is estopped from asserting a position other than that consistently taken on his tax returns").

Aside from the estoppel issues and Rosen's own testimony, Plaintiffs have

---

[9]

 Plaintiffs rely upon *Moore v. Weinberg*, 644 S.E.2d 740 (S.C. Ct.App. 2007), to argue that BMW cannot rely upon Rosen's voluntary termination of the April 2002 Agreement.  However, *Weinberg* is a novation case, and does not counter the estoppel issues raised by Rosen's conduct.  Moreover, even if the issue of novation is relevant, Plaintiffs reliance on *Weinberg* is misplaced.  That case did not involve a claim for tortious interference.  Breach of contract is an essential element of a tortious interference claim.  Therefore, BMW is entitled to rely on any contractual defenses that would be available in a breach of contract action in defending the tortious interference claim.

not created a genuine issue of fact regarding the duress claim.  The elements for a claim of duress are:

> (1) the coerced party must show that he has been the victim of a wrongful or unlawful act or threat, (2) such act or threat must be one which deprives the victim of his unfettered will, (3) as a direct result the coerced party must be compelled to make a disproportionate exchange of values or give up something for nothing, (4) the payment or exchange must be made solely for the purposes of protecting the coerced party's business or property interests, and (5) the coerced party must have no adequate legal remedy.

*Johnson v. Columbia*, 949 F.2d 127, 131-132 (4th Cir. 2005).

Plaintiffs have not demonstrated that Rosen was forced to enter into a contract against his will.  In evaluating a duress claim, one must consider the "capacity of the party influenced."  *Holler v. Holler*, 612 S.E.2d 469, 475 (S.C. Ct. App. 2005).  Rosen is a sophisticated businessman with a current net worth between $70 and $75 million.  At all times during this case, Rosen was represented by legal teams from at least three law firms.  Rosen also has his own in-house legal counsel.  The result of the supposed duress, the October 2003 Agreement, was the product of what Rosen's attorney described as "extensive" negotiations.  (Estridge Dep. p.110–111, Ex. 88 to BMW's Memorandum.)  During the relevant time period, Rosen never sought financing for the project.  Rosen executive Bill Thompson told the *Greenville News* on March 1, 2003 that "[n]o one has required us to provide the financing yet.  We're just getting started.  It's not to that stage yet."  (Thompson Dep. p.151–152, Ex. 43 to BMW's Memorandum.)  Additionally, during the period of his supposed duress, Rosen made proposals to Hollingsworth to obtain an interest in even more property in the area.  When the

October 2003 Agreement was signed, Rosen told the *Greenville News* that he was "pleased with the final deal." (Ex. 90 to BMW's Memorandum.) Given these facts, Plaintiffs have not demonstrated evidence that Rosen's will was not his own when he executed the October 2003 Agreement.

Even if Plaintiffs had met their burden on this point, Plaintiffs have provided no guidance as to how the Court would provide Plaintiffs with a remedy. Coercion is a defense to the enforcement of an otherwise valid contract. *Id.* at 475. The appropriate remedy for a successful claim of duress is to rescind the contract. *Id.* Plaintiffs have not addressed whether rescission is feasible in this matter and what the consequences of rescinding the October 2003 Agreement would be upon the subsequent contractual agreements Rosen and Clemson have entered with third parties.

2.    *Breach*

Breach of contract is an "essential element" of a tortious interference claim. *Eldeco, Inc. v. Charleston County Sch. Dist.*, 642 S.E.2d 726, 732 (S.C. 2007). Therefore, to succeed on a claim of tortious interference, Plaintiffs must show that AMREC breached a contract at the inducement of BMW. *Id.* at 561. It is insufficient for Plaintiffs to raise disputed facts that amount to a mere hindrance to performance of a contract. *Egrets Pointe Townhouses Prop. Owners Assoc., Inc. v. Fairfield Communities, Inc.*, 870 F. Supp. 110, 116 (D.S.C. 1994).

a.    *Repudiation*

Plaintiffs argue on page 50 of their Memorandum in Opposition that a

"breach occurred when AMREC refused to proceed under the April/May 2002 contracts, as written, and repeatedly denied there were contracts at all."  More specifically, Plaintiffs claim that the April 2002 Agreement was repudiated by President Barker of Clemson in his March 12, 2003 letter to Cliff Rosen.[10]  For a repudiation to occur:

> (1) the repudiation must be unequivocal[;] (2) the repudiation must be a "final and absolute declaration that the contract must be regarded as altogether off[;]" (3) the repudiation must be unconditional[;] (4) the repudiation cannot rest on a "partial breach" but must "go to the whole consideration of the contract," relate to the "very essence of the contract," and "defeat the object of the parties in making the contract[;]" (5) while the repudiation need not be express, if it rests on the defendant's conduct it must evince "a clear intention to refuse performance in the future[.]"

*Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 204 F. App'x 208, 211-212 (4th Cir. 2006) (applying South Carolina law).

Plaintiffs have not demonstrated that Clemson repudiated the April 2002 Agreement.  President Barker's assessment of the status of the relationship between the parties was accurate, and Plaintiffs have not created a genuine issue of material fact in this regard.  President Barker did not deny the existence of any agreement.  President Barker asserted that the April 2002 Agreement gave either

---

[10]

 Plaintiffs also rely upon a similar letter from Neill Cameron of Clemson to Rosen employee Bill Thompson dated May 13, 2003.  However, this letter adds little to the discussion, as Cameron relies upon and repeats the positions taken by President Barker.  Plaintiffs focus on of one of the concluding sentences of Cameron's letter stating "[a]s there is currently no agreement, nothing will be amended."  (Ex. 126 to Plaintiffs' Memorandum in Opposition.) However, it is clear from the preceding sentences that Cameron is referring to the failure to agree to all the Exhibits.  It is also noteworthy that this letter was sent at a time that the parties had exchanged proposals for a new agreement, and these negotiations ultimately led to the execution of the October 2003 Agreement.

party the right to cancel the agreement because all of the Exhibits to the April 2002 Agreement had not been completed on or before May 1, 2002.

The record reveals that agreement on all of the required Exhibits had not been reached by May 1, 2002, and the April 2002 Agreement was never amended to remove the requirement that the parties agree to the Exhibits identified therein. [11] Most importantly, the parties had not yet agreed on how the Hollingsworth Property was to be divided.  Exhibit G was to record the parties' agreement on what parcels of land would go to AMREC and what parcels would remain with Rosen.  Plaintiffs concede that this issue had not been resolved by May 1, 2002, and that Rosen did not make his first proposed property delineation until December 2002.  It is also undisputed that Clemson objected to Rosen's initial proposal. [12] The land delineations were not finally resolved until the October 2003 Agreement, which expressly terminated the April 2002 Agreement.  Plaintiffs claim on page 52 of their Memorandum in Opposition that the lack of agreement was "not an issue" because AMREC's attorneys included a sketch of the whole campus (without any delineations of any parcels) in a binder of the agreements that had been executed by May 1, 2002.  However, this artistic rendering, which was prepared well before the April 2002 Agreement was even executed, does not reflect any agreement by

---

[11] It is undisputed that the parties negotiated such an amendment to the April 2002 Agreement, yet never executed the document.  Instead, they executed the October 2003 Agreement, which terminated the April 2002 Agreement.

[12] Rosen has submitted an affidavit, filed on January 14, 2008, that artfully asserts that all parties were "aware" of the proposed parcel delineations by January 2003. (Rosen Aff. ¶ 15) However, he never alleges that Clemson agreed to the proposed delineations.  In any event, there was not a signed writing reflecting an agreement.

the parties on the land issue.

Plaintiffs' reliance upon Paragraph 20 of the April 2002 Agreement, which states that an Exhibit controls to the extent that it is inconsistent with the master agreement, is misplaced.[13]  The Exhibits were to manifest the parties' agreement on matters dealt with only in general terms by the master agreement.  Plaintiffs' argument ignores the fact that the parties never agreed to the land delineations. The artistic rendering contains no relevant information, and is only "inconsistent" with the April 2002 Agreement to the extent it does not satisfy the requirements for creating Exhibit G.[14]

The parties also had not agreed to Exhibits F and H by May 1, 2002.  As noted above, the parties proposed before May 1, 2002 to combine these two exhibits into one document referred to as the CCR.  They acknowledged that this change would need to be reflected in an amendment to the April 2002 Agreement. While the parties negotiated this proposed amendment throughout 2002, it was

---

[13]

 As an example of the potential application of this provision, the April 2002 Agreement states that Rosen would be the exclusive developer for the AMREC campus, yet the agreed to AMREC Campus Development Agreement provides that any State-funded project is an exception to Rosen's agreement and would not be subject to any development rights.  The more specific treatment in the agreed-upon Exhibit controls over the general statement in the master agreement.

[14]

 Even if the Court were to adopt Plaintiffs' reasoning, there still would be no breach as the contract would fail.  If this real estate agreement was "final" on May 1, 2002 with the land issue still unresolved, then the agreement would fail to include an essential term.  *See Player v. Chandler*, 382 S.E.2d 891 (S.C. 1989)(finding that the essential terms of a lease include "definite agreement as to the extent and boundary of the property to be leased").

never executed.[15]  Thus, the April 2002 Agreement at all times required agreement on these Exhibits prior to May 1, 2002.  Such an agreement was not reached until the CCR was finalized as part of the October 2003 Agreement.  Plaintiffs seek to excuse the lack of agreement on F and H by referring to the two placeholders inserted by John Campbell in the binder he prepared that contained the words "NOT USED."  (Plaintiffs' Memorandum in Opposition, p. 51.)  However, these placeholders are only relevant if they are an amendment to the April 2002 Agreement.  The pieces of paper are not signed writings, which would be required to modify the April 2002 Agreement, and it is undisputed that the agreement was never modified.  Plaintiffs argue that a question of fact exists because Rosen and his attorneys testified that they thought a "final, binding contract" was entered on May 1, 2002.  (Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment, p. 4.)  However, this type of conclusory statement does nothing to change the fact that these Exhibits were not done by May 1, 2002, and the parties never amended the requirement that they be completed.

Even if President Barker was incorrect when he wrote that the April 2002 Agreement was subject to cancellation, Plaintiffs still are not entitled to treat his letter as a breach.  First, the April 2002 Agreement required that Rosen provide AMREC with notice of any default under any of their agreements, including the

---

[15]

 While the change to the CCR was not incorporated into an amended master agreement, the CCR did find its way into the Exhibits.  The License Agreement expressly required that the CCR be completed.  It is undisputed that the CCR was not finalized until the October 2003 Agreement.  This further confirms that President Barker was correct that all of the necessary agreements had not been completed.

April 2002 Agreement.  It is undisputed that Plaintiffs never provided any such notice.  Therefore, Rosen did not perform all conditions precedent to treating the letter as a breach.  Setting aside the contractual requirements, if Rosen reasonably doubted AMREC's willingness to perform, he was not entitled to treat the letter as a breach unless he first sought adequate assurances that AMREC would perform in the future.  Restatement (Second) of Contracts § 251 (1981).  It is undisputed that Rosen never wrote back to President Barker, never sought adequate assurances, and never sought to correct any errors supposedly made by President Barker. [16] Instead, Rosen opted to negotiate a new agreement with Clemson that terminated the April 2002 Agreement "for all purposes."  (Ex. 89 to BMW's Memorandum.)  Having done so, Plaintiffs cannot now characterize President Barker's letter as a repudiation.

b.    *Other Alleged Breach*

Plaintiffs also allege on page 15 of their Partial Summary Judgment Memorandum that AMREC breached its contractual obligations by failing to make Clemson employee Don Rice available for up to 80% of his time "promoting and securing pre-sales or letters of intent."  As an initial matter, the provision Plaintiffs refer to is found in the Operating Agreement of WT, LLC.  Plaintiffs did not identify this agreement in its First Amended Complaint as having been breached.  This agreement is the operating agreement of WT, LLC, a South Carolina entity that would destroy subject matter jurisdiction as a necessary party.  Moreover, the

---

[16] Rosen also did not respond to Cameron's letter.

provision Plaintiffs are relying upon never mentions "presales" or "letters of intent."[17]  Plaintiffs' interpretation of this provision is not reasonable and cannot serve as the basis for a breach claim.  Plaintiffs also allege that AMREC breached an obligation to "mutually develop" a marketing plan.  (Plaintiffs' Partial Summary Judgment Memorandum, p. 10.)  There is not any factual basis to allege that AMREC rejected an overture to complete a marketing plan.  The record reveals the opposite, as it was President Barker, in his March 12 letter, faulting Rosen for his lack of focus on the marketing plan.

Finally, Plaintiffs appear to argue that it was somehow inappropriate for BMW and Clemson to investigate alternate sites for the GEC when negotiations with Rosen broke down in early 2003.  Plaintiffs claim on page 66 of their Memorandum in Opposition that under the License Agreement Clemson "could not allow its marks to be used on any public/private motorsports park . . . ."  Contrary to Plaintiffs' assertion, the License Agreement does not in any way limit Clemson University's use of its own marks.  The provision in question does limit Clemson's ability to license its marks to a third party for an automotive research park.  However, the GEC is a Clemson University school, not a private facility.  Plaintiffs have not alleged that Clemson ever entered such a third party license.  Therefore,

---

[17]  The relevant provision actually refers to making Don Rice available for "up to 80%" of Don Rice's time for "promotion and operations" of the wind tunnel.  (Ex. 74 to Plaintiffs' Memorandum in Opposition.)  Plaintiffs allege Rice was failing to satisfy this obligation and had cut off contact with Rosen in early March 2003. However, Plaintiffs contradict their own argument by submitting evidence that Rice was attempting to secure commitments for the wind tunnel throughout 2003 and referring in their First Amended Complaint to communications with Don Rice after the time when Rice allegedly quit speaking to Rosen.

Plaintiffs have not created a genuine issue of material fact in this regard.

3.     *Inducement of a Breach*

Not only must Plaintiffs demonstrate that a breach occurred, they must also show that the breach was proximately caused by the wrongful acts of BMW. *Smith v. Citizens and Southern National Bank of S.C.*, 128 S.E.2d 112, 114 (S.C. 1962). Stated another way, Plaintiffs "must show that, but for the interference, the contractual relationship would have continued." *Jones Eng'g Sales, Inc. v. Faulkner/Baker & Assocs.*, 1999 U.S. App. LEXIS 26920 (4th Cir. Oct. 26, 1999)(citations and quotation omitted).  Plaintiffs have not met their burden in this regard.

Plaintiffs rely upon the letters written by President Barker and Neill Cameron to establish a breach.[18]  Even assuming that these letters constitute a breach, Plaintiffs must further demonstrate that the letters were sent at the inducement of BMW.  However, there is no evidence that the letters were written or sent at the behest of BMW.  The Clemson witnesses testified uniformly that BMW was not involved in this process and that the letters were sent because of Clemson's concerns over Rosen's perceived lack of commitment to building a wind tunnel. Plaintiffs have not introduced evidence to rebut this testimony, but instead ask the Court to infer that Clemson was acting at BMW's behest based upon the regular communications during the time period that the letters were sent between BMW,

---

[18]  Plaintiffs' assertions relating to the 80% provision discussed above are inextricably tied to the wind tunnel dispute discussed in the letters exchanged between Rosen and President Barker. Plaintiffs' proof as to BMW's role in urging AMREC not to promote the wind tunnel is no stronger than its proof that BMW induced President Barker to write his letter.

Clemson, and AMREC and the fact that BMW was making available millions of dollars for the development of the GEC through its incentive package. Such an inference is without sufficient evidentiary basis. President Barker's letter purports to respond to Cliff Rosen's letter of January 21, 2003 detailing Rosen's difficulties in financing the wind tunnel and claiming that Clemson was obligated to deliver presales for the wind tunnel. President Barker's letter responds to these allegations and requests assurances that the wind tunnel will be built. Plaintiffs have not created a genuine issue of material fact that BMW was the proximate cause of the position Clemson reached in President Barker's letter.

4.    *Justification*

Absence of justification is an essential element of a tortious interference claim. *Waldrep Bros. Beauty Supply, Inc. v. Wynn Beauty Supply Co.*, 992 F.2d 59, 62 (4th Cir. 1993). The absence of justification means conduct that is carried out for an improper purpose, such as malice or spite, or through improper means, such as violence or intimidation. *Id.* at 63. Plaintiffs have not demonstrated that BMW acted for an improper purpose or employed improper means.

a.    *Improper Purpose*

If some legitimate purpose or right exists, liability cannot be imposed even if the defendant exercises that right for a malicious reason. *Id.* Moreover, if a defendant acts for more than one purpose, the improper purpose must predominate in order to create liability. *Crandall Corp. v. Navistar Int'l Transp. Corp*, 395 S.E.2d 179, 180 (S.C. 1990).

It is undisputed that BMW was motivated at least in part by a desire to find a location for the State-funded GEC pursuant to its role under the Bond Act.  The Bond Act required that any infrastructure project (*e.g.* the GEC) must relate specifically to the economic development project (*e.g.* BMW's $400 million investment and willingness to create 400 jobs in South Carolina) for which it is being contemplated.  This means that the GEC had to support BMW's plans for the State funding to be available.  Moreover, BMW was contemplating a $10 million gift to Clemson to endow a chair at the GEC.  BMW was entitled to express its requirements before making the gift.  For these reasons, BMW had a legal right to be involved in the development of the GEC.  This right constitutes a legitimate purpose.

Plaintiffs further allege that BMW was interested in securing portions of the Hollingsworth Property to bring in suppliers and to locate research facilities on a site "virtually adjacent" to BMW's Spartanburg plant.  (1st Am. Compl. ¶ 94; Plaintiffs' Memorandum in Opposition, p. 9.)  These would also constitute legitimate business purposes.  Indeed, Plaintiffs allegations cast BMW as a business competitor.  Rosen's April 2003 proposal to Clemson makes clear that Rosen anticipated securing BMW suppliers as tenants for the site, which would put Plaintiffs in competition with BMW in that regard.  This type of competitive activity would clearly be justified.  *See Waldrep Bros.*, 992 F.2d at 63.

Plaintiffs summarily assert that BMW had an improper motive, yet never identify the improper motive or support this allegation.  In any event, Plaintiffs do

not argue that this undefined improper purpose predominated over the multiple legitimate purposes discussed above that have been acknowledged and alleged by Plaintiffs.  Plaintiffs seek to circumvent this issue by arguing that whenever an alleged interferor is not enforcing a contract to which they are a party, then justification is a question of fact for the jury to decide.  This is not an accurate statement of South Carolina law.  Justification exists whenever a party is enforcing a "legal right." *Id.* at 561.  The justification element applies to any legal right, including statutory rights. *Gailliard v. Fleet Mortgage Corp.*, 880 F. Supp. 1085, 1089-90 (D.S.C. 1995).  Summary judgment is appropriate when a party is pursuing non-contractual rights.  *See id.* (granting summary judgment where defendant lender had not yet entered a contract to loan money to the object of the alleged interference); *see also Waldrep Bros.*, 992 F.2d at 64 (holding that judgment for defendant was appropriate in tortious interference action where defendant did not have a contract under which it was enforcing rights).

b.    *Improper Means*

Improper means are defined as "means that are illegal or independently tortious." *Love v. Gamble*, 448 S.E.2d 876, 883 (S.C. Ct. App. 1994) (internal quotes omitted).  In South Carolina, "improper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Waldrep Bros.*, 992 F.2d at 63.  In their legal argument, Plaintiffs do not identify a single example of the use of

47

improper means by BMW.  Instead, they summarily conclude that "[t]he record in this case is replete with evidence that BMW's conduct was for an improper purpose and that improper means were employed."  (Plaintiffs' Memorandum in Opposition, p. 63.)  This statement is insufficient to meet Plaintiffs' burden.

Notably, Plaintiffs have not submitted any evidence of conduct by BMW that falls within the range of improper conduct described above.  Instead, it appears Plaintiffs seek to attribute to BMW the actions of third parties, many of them governmental actors under the *Noerr-Pennington* doctrine, to meet the improper means requirement.    For  instance,  Plaintiffs  allege  on  page  45  of  their Memorandum in Opposition that "BMW also used governmental officials to attempt to improperly coerce other governmental officials."  Included in the "improper" conduct by third parties are supposed threats made by Governor Mark Sanford and Secretary of Commerce Bob Faith towards officials with the City of Greenville. Even viewing the facts in the light most favorable to Plaintiffs, these statements are not actionable.

For a statement to be an actionable threat, it must involve some threat of harm.  *See Brooker v. Silverthorne*, 99 S.E. 350 (S.C. 1919).  Plaintiffs have submitted no evidence that Governor Sanford threatened Mayor White with harm, and it is clear that the "alarm" Mayor White testified to feeling related to the negative economic impact the loss of the project would have on Greenville.  (White Dep. 21-24, Ex. 1 to Plaintiffs' Memorandum in Opposition.)  Similarly, Plaintiffs allege that Secretary Faith threatened Greenville City Councilman Gary Coulter by

asking him to stop an article from appearing in the newspaper. While Coulter initially described the incident as a threat, he later described the incident as "politics as usual[,]" and admitted that he was not threatened with harm. (Coulter Dep. p. 46-47, Ex. 2 to Plaintiffs' Memorandum in Opposition.) It is also worth noting that Coulter refused to comply with Secretary Faith's request, and the article ran as scheduled, meaning that no actionable harm to Rosen could have resulted from this episode. Finally, even if the "threats" by Governor Sanford and Secretary Faith were actionable, Plaintiffs have failed to demonstrate how the statements are attributable to BMW and fail to acknowledge the obvious *Noerr-Pennington* issues raised by Plaintiffs' reliance on the actions of these governmental officials.

Plaintiffs further allege that BMW carried out a public relations campaign against Cliff Rosen, and that the negative publicity generated by this alleged PR campaign prevented Plaintiffs from moving forward with the project. Plaintiffs do not cite any supposedly negative statements by BMW, but instead rely upon statements by third parties like Secretary Faith. Yet even as to these third parties, Plaintiffs never specifically identify the supposedly improper press statements or explain why they are actionable. BMW has exhibited the articles regarding the project that ran during the relevant period of 2003, and these articles do not reasonably support an inference that BMW was orchestrating a PR plan directed against Rosen. To the contrary, BMW has cited deposition testimony of Tom Wells, a Rosen executive, who testified to his belief that the "negative" press

included accurate statements regarding the status of the project. (Wells Dep. p.144–149, Ex. 73 to BMW's Memorandum.) For instance, Wells took issue with statements Secretary Faith made on or about March 3, 2003, including: "it has not been decided where the grad school of engineering is going to go." *Id.* It is undisputed that this statement was accurate, as Rosen has admitted under oath that there was no contractual obligation to place the GEC on his property. Yet Wells characterized Secretary Faith's accurate statements as "negative" because "they didn't make a commitment putting the school on the Clemson campus at that time." *Id.* Plaintiffs cannot establish improper means through such allegations, and BMW is entitled to summary judgment on the justification element.

C.     *Prospective Interference with Contract*

Plaintiffs second cause of action alleges that if the contracts alleged to have been interfered with in the first cause of action were not valid and enforceable contracts, then these contracts represented expectancies that were interfered with by BMW. Plaintiffs cannot proceed on their prospective interference claim because Plaintiffs realized any expectancy they may have had with Clemson in the October 2003 Agreement.[19]

The tort of interference with prospective contractual relations contains the following elements: (1) the defendant intentionally interfered with the plaintiff's potential contractual relations; (2) for an improper purpose or by improper methods;

---

[19] As was the case in the first cause of action, Plaintiffs list the Hollingsworth Contract as one of the potential expectancies interfered with. However, there is no allegation in the record that the Hollingsworth Contract was not a valid and enforceable contract.

(3) causing injury to plaintiff. *Crandall Corp.*, 395 S.E.2d at 180. A claim for prospective interference cannot stand if the plaintiff is able to consummate a contract with the third party. *Egrets Pointe*, 870 F. Supp. at 116; *see also Gailliard*, 880 F. Supp. at 1091. It is irrelevant if a plaintiff could have realized a better deal but for the actions of the defendant, because the term "potential" contractual relations does not mean full contractual relations. *Egrets Pointe*, 870 F. Supp. at 116. Tortious interference claims cannot be predicated on conduct that was a mere "hindrance" to contract formation. *Id.*

Plaintiffs cannot assert a claim for prospective interference for the simple reason that Rosen entered into an agreement with Clemson by executing the October 2003 Agreement. The October 2003 Agreement expressly terminated each of the agreements that underlie the prospective interference claim. Plaintiffs cannot recover on a theory that the consummated October 2003 Agreement was less profitable to them than it would have been without BMW's interference; it is not actionable to be a "hindrance" to an agreement. *Id.*

Finally, Plaintiffs must support their prospective interference claim with a similar showing of improper means or purpose as is required to support their tortious interference claim. As discussed more fully above, Plaintiffs have not demonstrated that BMW acted with an improper motive or used improper means.

D.    *Civil Conspiracy*

Plaintiffs third cause of action alleges that BMW conspired with "agents or representative of Clemson and/or agents or representatives of the State of South

Carolina, for the purpose of injuring Plaintiffs." (1st Am. Compl. ¶190.)   A civil conspiracy cause of action contains the following elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes the plaintiff special damage.   *Vaught v. Waites*, 387 S.E.2d 91, 95 (S.C. Ct. App. 1989). To recover on a conspiracy claim, Plaintiffs must show that the "object of the conspiracy was to ruin or damage the business of another."   *Waldrep Bros.*, 992 F.2d at 63.  BMW is entitled to summary judgment on this cause of action.

As an initial matter, any efforts by BMW to lobby the State of South Carolina and Clemson University are protected by the *Noerr-Pennington* doctrine.  *See City of Columbia*, 499 U.S. at 383.  Recasting the claim as one for conspiracy does not change this result, as the Supreme Court has rejected the argument that there is a conspiracy exception to *Noerr-Pennington*.  *Id.*  Setting aside the *Noerr-Pennington* issue, a conspiracy claim requires proof that the defendant was acting not in pursuit of its own business objectives, but to "ruin or damage" the plaintiff. *Waldrep*, 992 F.2d at 63.  Plaintiffs have not alleged that BMW was acting to ruin their business, much less elicited any evidence of such a motive.  As noted above, Plaintiffs actually allege BMW was pursuing legitimate business purposes. Moreover, the record is clear that BMW was motivated by its desire to establish the GEC, which again constitutes a legitimate purpose.

To properly plead a cause of action for civil conspiracy, the plaintiff must allege certain acts carried out pursuant to the conspiracy.  *See Lee v. Chesterfield Gen. Hosp., Inc.*, 344 S.E.2d 379, 382 (S.C. Ct. App. 1986).  The acts alleged to

constitute the conspiracy cannot be identical to the acts alleged in support of other causes of action. *Kuznik v. Bees Ferry Assocs.*, 538 S.E.2d 15, 31 (S.C. Ct. App. 2000). In addition, damages pled in a claim for civil conspiracy must be pled with specificity. Fed. R. Civ. P. 9(g). Special damages must also be different than damages pled for other causes of action in the same complaint. *Charleston Aluminum, LLC v. Samuel, Son & Co., Inc.*, 2006 U.S. Dist. LEXIS 60845 (D.S.C. August 15, 2006). Summary judgment is appropriate when the damages claimed for conspiracy overlap with or are subsumed by the damages sought for other causes of action. *Parkman v. Univ. of South Carolina*, 44 F. App'x 606, 620 (4th Cir. 2002).

Plaintiffs' third cause of action generically restates the allegations made in support of its earlier causes of action. It does not contain any unique factual allegations and is in no way factually distinguishable from the other causes of action alleged against BMW. Similarly, the only special damages identified by Plaintiffs in their third cause of action are "loss of profits and loss of development and management fees." (1st Am. Compl. ¶191.) Yet Plaintiffs have included the identical language of "loss of profits and loss of development and management fees" in all three of their causes of action. Because Plaintiffs have failed to allege special damages that are distinct from the damages sought in their other causes of action, summary judgment on this claim is further justified.

E.     *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs have moved for partial summary judgment on two elements of their

cause of action for tortious interference with contract. Plaintiffs' motion is rendered moot by the Court's resolution of BMW's Motion for Summary Judgment. Even as to the merits, Plaintiffs' motion would be denied because it improperly seeks summary judgment on select factual issues rather than an entire cause of action. *Evergreen Int'l, S.A. v. Marinex Constr. Co.*, 477 F. Supp. 2d 697, 698-99 (D.S.C. 2007).

## III. CONCLUSION

After careful review of the memoranda and evidence submitted by the parties, it is clear that Plaintiffs have not created a genuine issue of material fact as to each essential element of their case. Not only does the *Noerr-Pennington* doctrine provide a complete defense to all causes of action asserted against BMW, Plaintiffs have further failed to meet their burden as to the individual causes of action asserted in the First Amended Complaint.

IT IS THEREFORE ORDERED that BMW's Motion for Summary Judgment is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment is DENIED as moot.

IT IS SO ORDERED.

_____

G. ROSS ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

Anderson, South Carolina

January 31, 2008